IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MILINDA MARTINEZ                                                    PLAINTIFF

      V.                       Civil No. 2:20-cv-02144-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Milinda Martinez, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration ("Commissioner")

denying her claims for disability insurance benefits ("DIB") and supplemental security income

("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.   42

U.S.C. § 405(g).

## I.      Procedural Background

Plaintiff filed her applications for DIB and SSI on June 13, 2017, and August 1, 2017,

respectively, alleging disability since February 10, 2016, due to bipolar disorder, attention deficit

disorder (ADD), back and neck pain, the residuals of right knee surgery, and seizure disorder.

(ECF No. 16-4, pp. 2-3, 14-15, 31; ECF No. 16-6, pp. 2-15; ECF No. 16-7, pp. 6, 40-41).  The

Commissioner denied Plaintiff's applications initially and on reconsideration.  At her request, an

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

administrative hearing was held on May 21, 2019.  (ECF No. 16-3, pp. 125-148).  Plaintiff was present and represented by counsel.

On her alleged onset date, Plaintiff was 37 years old and possessed a high school education and an Associate Certificate in Child Development but no actual degree.  (ECF No. 16-11, p. 17).  She also served two years in the Army National Guard, earning a general discharge after missing weekend drills.  (*Id*.).  Although she had past relevant work ("PRW") experience as a referral clerk, stock clerk, secretary, and legal secretary, she performed no substantial gainful activity after her alleged onset date.  (ECF No. 16-6, pp. 7, 25-31).

On July 16, 2019, the ALJ found Plaintiff's epilepsy, osteoarthritis, back disorder, anxiety, and depression to be severe impairments.  (ECF No. 16-3, p. 68).  He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.).  Further, the ALJ found she could still perform sedentary work requiring only occasional balancing, stooping, kneeling, crouching, crawling, and climbing (stairs/ramps); no climbing of ropes/ladders/scaffolds; and no exposure to unprotected heights or moving machinery.  (*Id*. at 69).  From a mental perspective, the ALJ restricted Plaintiff to simple, routine, and repetitive tasks; occasional interaction with coworkers, supervisors, and the public; and simple, direct, and concrete supervision.  (*Id*.).  With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as an addressing clerk, toy stuffer, and tile table worker.  (*Id*. at 78).

On June 25, 2020, the Appeals Council denied Plaintiff's request for review, and Plaintiff subsequently filed her Complaint to initiate this action.  (ECF No. 16-2, pp. 2-6; ECF No. 2).  Both parties have now filed appeal briefs (ECF Nos. 19, 20), and the matter is ripe for resolution.  The case has been referred to the undersigned for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    Discussion

Plaintiff raises three issues on appeal: (1) whether substantial evidence supports the ALJ's RFC determination; (2) whether the ALJ conducted a proper subjective complaint analysis; and (3) whether the ALJ's Step Five determination is supported by the overall record.

### A.    RFC Determination

Plaintiff first contends that the ALJ's RFC determination is not supported by substantial evidence because it fails to accurately account for all her impairments and does not include a valid explanation for the ALJ's dismissal of the medical source opinions that detract from his decision. RFC is the most a person can do despite that person's limitations.  20 C.F.R. §§ 404.1545, 416.945. However, the disability claimant, rather than the ALJ, has the burden of establishing her RFC. *Vossen*, 612 F. 3d at 1016.  "The ALJ [then] determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from

symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

At the outset, a fair reading of the ALJ's decision shows that his reference to light work is a scrivener's error that does not affect the integrity of his decision. *See Strongson v. Barnhart*, 316 F.3d 1066, 1072 (8th Cir. 2004) ("arguable deficiency in opinion-writing technique" had no bearing on the outcome of case and did not warrant remand). Although the actual RFC finding states that the Plaintiff could perform light work, in his discussion, the ALJ found the state agency medical consultants' opinions that Plaintiff could perform sedentary work persuasive. He then concluded that Plaintiff retained "the residual functional capacity to perform a range of sedentary unskilled work." And, in his step five discussion, he referenced only sedentary jobs. Thus, it seems clear that the word "light" in the RFC finding is simply an error. Therefore, to the extent the Plaintiff argues she is incapable of performing light work, her argument is moot.

### 1.      Physical RFC

In this case, the ALJ considered the evidence of record, including examinations and objective testing, medical source statements prepared by Plaintiff's treating physicians, the opinions of two state agency physicians, Plaintiff's testimony, third party seizure witness statements, and her reported activities before concluding she could perform sedentary work with postural and environmental limitations. In so doing, he properly noted Plaintiff's history of treatment for neck, low back and knee pain, and epilepsy. A summary of Plaintiff's treatment history follows.

### a.  Summary of Relevant Medical Evidence

Prior to Plaintiff's alleged onset date, x-rays of her lumbar spine revealed very mild degenerative disk disease ("DDD") at the L1-L5 levels without subluxation, desiccation, or

fractures.  (ECF No. 16-9, p. 55; ECF No. 16-11, pp. 22, 105).  An MRI, however, showed a right paracentral disk protrusion at the L5-S1 level with central protrusion and a small right lateral protrusion at the L4-5 and L5-S1 levels.  (ECF No. 16-9, p. 64).

During the year leading up to Plaintiff's alleged onset date of February 10, 2016, she sought out medical treatment for her allegedly disabling physical impairments on only two occasions.  In August 2015, Plaintiff established care with Advanced Practical Nurse ("APRN") Travis Walling. (ECF No. 16-10, pp. 72-74).  Despite suffering from "constant" back and bilateral leg pain, she was taking no medication.  An exam revealed pain with a decreased range of motion ("ROM") in her lumbar spine, however, her strength, reflexes, and gait were normal.  Nurse Walling prescribed Meloxicam and Flexeril and referred her to physical therapy ("PT").  It appears that the Plaintiff presented for the initial PT assessment but failed to return for additional therapy sessions.

In October 2016, Plaintiff saw pain specialist, Genevieve Dulan, M.D., at Long Term Solutions ("LTS"), for complaints of low back pain.  (ECF No. 16-9, p. 26; ECF No. 16-11, p. 104).  She reported improvement in both her pain level and her activities of daily living ("ADLs"). The only abnormality noted was abnormal reflexes on the right side.  Dr. Dulan diagnosed Plaintiff with DDD and a bulging disk at the L4-L5 level.  She instructed her regarding home exercises and the use of a TENS unit.

At follow-up visits in November, December and January, Plaintiff continued to report improvement in her pain and her ADLs.  (ECF No. 16-9, p. 22-25; ECF No. 16-11, p. 100).  In November 2016, she exhibited some crepitus and swelling in her knees, but her lumbar ROM, gait, and reflexes were normal, and she was able to walk and squat.  (ECF No. 16-9, p. 25; ECF No. 16-11, 103).  The following month, she reported chronic neck and back pain, but stated that her pain was "OK on meds."  (ECF No. 16-9, p. 24; ECF No. 16-11, p. 102).  And, in early January

2017, Plaintiff's exam was unremarkable, as she described her pain as "stable" and her ADLs as unchanged.  (ECF No. 16-9, p. 22; ECF No. 16-11, p. 100).  Later that month, she sought out emergency treatment after twisting her knee.  (ECF No. 16-9, p. 23; ECF No. 16-11, p. 101).  On exam, Plaintiff exhibited effusion in the right knee and an antalgic gait, and x-rays were normal.  The Emergency Room ("ER") doctor diagnosed her with an acute injury to the right knee before prescribing Hydrocodone.  (ECF No. 16-9, p. 61; ECF No. 16-10, pp. 58-60, 127-128, 170-171; ECF No. 16-11, pp. 28, 111).

On February 14, 2017, Plaintiff saw orthopedist, Thomas E. Cheyne, M.D., regarding her knee.  (ECF No. 16-10, pp. 56-57).  An exam revealed effusion and a reduced ROM in the knee with no sign of gross instability.  Sensation, strength, and muscle tone in her legs were normal, as were x-rays of her right knee.  Dr. Cheyne ordered an MRI, which was suspicious for a medial meniscal tear.  (ECF No. 16-9, p. 60; ECF No. 16-10, pp. 114-115, 163; ECF No. 16-11, pp. 27, 110).  Accordingly, Dr. Cheyne diagnosed her with a right medial meniscal tear and referred her to an orthopedic surgeon.  (ECF No. 16-10, pp. 52-53).

In March and April 2017, Plaintiff followed up with Dr. Dulan for complaints of neck and back pain.  (ECF No. 16-9, pp. 14, 18-20; ECF No. 16-11, pp. 97-99).  In March, she exhibited unspecified muscle spasms.  The following month, Plaintiff reported doing "fairly well," again describing her pain as stable and her ADLs as unchanged.  Dr. Dulan noted a limited ROM in Plaintiff's lumbar spine.  (ECF No. 16-9, p. 14).  In late April her pain remained stable, her ADLs unchanged, and her exam unremarkable.  (ECF No. 16-11, p. 97).  Dr. Dulan prescribed Oxycodone and added Celebrex.

On March 22, Plaintiff established care with Jessiela Venis Roberts, M.D. for worsening neck pain over the previous month, new onset of seizure activity witnessed by her spouse, and a

history of urinary incontinence with sneezing and coughing.  (ECF No. 16-10, pp. 53-56).  She was tender along the cervical spine, but no other abnormalities were noted.  X-rays of her neck revealed only "slight" disc space narrowing at the C5-6 level with anterior spur formation and straightening of the cervical spine, possibly attributable to muscle spasm.  (ECF No. 16-9, p. 59; ECF No. 16-10, pp. 53, 118-119, 164-165; ECF No. 16-11, pp. 26, 109).  An MRI of Plaintiff's lumbar spine revealed small disc protrusions at the L4-L5 and L5-S1 levels with mild facet arthropathy, mild canal stenosis and moderate lateral recess narrowing.  (ECF No. 16-9, p. 58; ECF No. 16-10, pp. 112-114, 161-162; ECF No. 16-11, pp. 25, 108).  Dr. Roberts concluded that her symptoms were likely worsened by these muscle spasms, recommended NSAIDs, prescribed Gabapentin and Cyclobenzaprine, and referred her to a neurosurgeon.

The following month, Plaintiff consulted with neurologist, Steve-Felix Belinga, M.D., after experiencing two seizure-like spells in a six-month period.  (ECF No. 16-10, pp. 49-52).  She reported that these spells were improving, and her exam was normal, aside from a narrow-based gait.  Dr. Belinga diagnosed Plaintiff with complex partial seizure disorder, prescribed Keppra, and ordered an EEG and MRI of her brain.  The MRI of her brain was ultimately normal.  (ECF No. 16-10, pp. 111-112, 149, 158-160; ECF No. 16-11, p. 23).

Neurosurgeon, Timothy Garlow, M.D., evaluated her on May 1, 2017.  (ECF No. 16-10, pp. 47-48).  Her right knee was too painful to perform McMurray's testing or pivot shifting, but she demonstrated a full ROM in the knee, good stability, and negative Lachman's and drawer tests.  An x-ray was also essentially negative.  (ECF No. 16-9, p. 62; ECF No. 16-10, pp. 111, 157; ECF No. 16-11, pp. 29, 112).  Dr. Garlow recommended a partial medial meniscectomy.

On May 12, 2017, her physical exam remained unchanged.  (ECF No. 16-10, pp. 44-45).  Dr. Roberts assessed Plaintiff with cervical neck pain with evidence of disc disease and muscle

8

spasm; prescribed Cyclobenzaprine; recommended continued pain management; and she provided referrals to PT and neurosurgery for a discussion of her long-term treatment options.

On May 18, 2017, Dr. Garlow performed an arthroscopic meniscectomy and chondroplasties of the medial femoral condyle and lateral plateau.  (ECF No. 16-10, pp. 39-43). At a post-surgical follow-up on May 31, Plaintiff was sore but able to ambulate around the house and go to the grocery store.  (*Id*. at 38).  She reported significant symptom improvement and, on exam, exhibited tenderness over the medial compartment, a full ROM, normal neurovascular findings, and no crepitus, instability, swelling, effusion, or redness.  The Physician's Assistant instructed her to progress with her activities at home.

The following month, Plaintiff visited the ER after dropping a heavy box on her left foot and injuring her ankle.  (ECF No. 16-8, pp. 35-59; ECF No. 16-10, pp. 35-38).  Upon examination, the doctor noted bruising, tenderness, and swelling in the left foot but x-rays were negative.  (ECF No. 16-10, p. 155-157).  He diagnosed an ankle sprain and prescribed Hydrocodone and Promethazine.  Two days later, she returned to LTS with complaints of worsening foot, knee, and neck pain and crepitus in the knee.  (ECF No. 16-9, p. 17; ECF No. 16-11, p. 96).  Dr. Dulan prescribed Oxycodone.

On June 19, 2017, she presented to the ER with an altered mental state, which she attributed to seizure-like activity.  (ECF No. 16-10, pp. 30-35).  Her daughter, however, reported that she had been "shooting up meth or heroin," prompting Plaintiff to admit to using illicit drugs, including marijuana.  An exam revealed her to be fully oriented and in no acute distress with a normal mood, affect, and behavior.  A CT scan of Plaintiff's head was normal, and her physical exam was unremarkable.  (ECF No. 16-9, pp. 56; ECF No. 16-10, pp. 29, 100; ECF No. 16-11, p. 106).

At her July 13, 2017, visit at LTS, Plaintiff reported her pain as stable, stating that her ADLs were unchanged.  (ECF No. 16-9, p. 16; ECF No. 16-11, p. 95).  Other than some right knee crepitus, exam findings were normal, and Dr. Dulan refilled her Oxycodone.

Plaintiff also conferred with Dr. Garlow in July and August for post-surgical follow-ups. (ECF No. 16-10, pp. 22, 28-29).  She reported some continued soreness and swelling if she did "too much."  Dr. Garlow noted some slight effusion and irritability along the medial joint line; however, her motion was "benign," and she showed no signs of erythema or instability.  He prescribed an anti-inflammatory and administered a steroid injection.  A repeat EEG in August was normal.  (ECF No. 16-10, p. 148).  And, later that month, Plaintiff reported some improvement, indicating she was now going to the gym.  However, she continued to struggle with plantar flexion.  (*Id.* at 22).  Dr. Garlow refilled the Meloxicam and advised her to wear appropriate shoes.

On August 21, 2017, Plaintiff also saw neurosurgeon, Joseph Queeney, D.O., with complaints of chronic low back pain with pain and numbness radiating down into her right foot and left thigh.  (ECF No. 16-8, pp. 65-71; ECF No. 16-10, pp. 23-28).  Her pain was worse with activity, but rest and changing positions relieved her symptoms.  On exam, she had reduced or absent reflexes in her lower extremities and tenderness in the left lumbosacral region, but normal strength and sensation, negative SLR tests, and an unremarkable Patrick's test.  Dr. Queeney concluded her pain was likely due to facet arthritis at the L4-L5 and L5-S1 levels, recommending anti-inflammatory medication and facet injections instead of surgery.  This angered Plaintiff's husband, prompting Dr. Queeney to recommend they seek out a second opinion.  X-rays taken in late August showed "scattered, mild," DDD and facet arthropathy at the L4-L5 and L5-S1 levels. (ECF No. 16-9, p. 56; ECF No. 16-10, pp. 93-94, 147-148; ECF No. 16-11, pp. 23, 106-107).

Plaintiff followed up at LTS in August, September, October, and November 2017. (ECF No. 16-9, pp. 12-15; ECF No. 16-11, pp. 91-94). In August and September 2017, she described her pain as stable and her daily activities as unchanged and a physical exam documented a reduced ROM in her lumbar spine. (ECF No. 16-9, pp. 14-15). The following month, she described some increased pain in her right knee. (*Id*. at 12). Aside from pain along the medial joint line and some crepitance, her physical exam was normal and showed full motion and no instability. Dr. Garlow administered a steroid injection. He administered a second injection on November 17. (ECF No. 16-10, pp. 20-21). Although her ROM was full, she had pain along the medial joint line and some crepitance in the patellofemoral joint.

In September 2017, James Hazlewood, M.D., a non-examining agency medical consultant, reviewed the record and opined that Plaintiff retained the RFC to perform sedentary work with occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps/stairs and no climbing ladders/ropes/scaffolds or exposure to hazards. (ECF No. 16-4, pp. 9-12, 21-24).

On November 20, 2017, Plaintiff was evaluated by physical therapy. (ECF No. 16-8, pp. 125-130; ECF No. 16-10, pp. 17-20). She was not taking any medication for her pain, despite rating her pain as a 6/10. Her hamstrings were tight with posterior tilt and she exhibited tenderness to palpation; a reduced ROM in her lumbar spine and piriformis muscles; 4/5 strength with hip flexion; full muscle strength elsewhere in her lower extremities; an unremarkable SLR test; and a slightly antalgic gait while wearing a knee brace. She was able to sit and rise from a seated position and stand independently.

On December 2, 2017, she visited the ER following a seizure that reportedly lasted three to four minutes. (ECF No. 16-10, pp. 12-17). Plaintiff also admitted to taking Roxicodone and using marijuana, and her drug screen was positive for amphetamines and cannabinoids. (*Id*. at 77-

93).  Both a physical exam and a CT scan of her head were unremarkable.  (*Id*. at 143-144).

Following diagnoses of seizure disorder and amphetamine and psychostimulant intoxication, the

doctor discharged Plaintiff to continue her current medications.

Four days later, she followed up with Nurse Walling.  (ECF No. 16-10, pp. 10-11).

However, she indicated that the Meloxicam relieved her knee pain.  Aside from right knee

tenderness, her exam was normal, and Nurse Walling refilled the Meloxicam.

On December 21, 2017, Plaintiff's mother, father, and daughter completed seizure

statements wherein they reported observing only one of the Plaintiff's seizures.  (ECF No. 16-7,

pp. 33-36, 38-39).  By their accounts, during an episode, her eyes rolled back into her head, her

body stiffened, she began to shake, and saliva dripped from her mouth.  Afterward, although she

was awake, she was not responsive to directions and did not remember the episode.  Plaintiff also

completed a seizure statement indicating that she usually blacked out during seizures.  (ECF No.

16-7, pp. 32, 37).  Afterward, she experienced body aches.  She indicated that her last attacks

occurred in August and December 2017, having experienced one in the past month and four in the

past year.  Further, she stated that Dr. Belinga had prescribed Keppra.

A second CT of her head, performed in December 2017, was normal.  (ECF No. 16-10, pp.

143-144).  And, on December 27, 2017, Plaintiff told Dr. Belinga that her last seizure was three

months prior.  (*Id*. at 8-11).  On exam, she was alert, attentive, fully oriented, and able to follow

commands appropriately.  Despite her improvement with medication, she wanted to change her

medication because it was sedating.  Therefore, Dr. Belinga prescribed Tegretol.

Plaintiff followed up at LTS in December 2017 and January 2018.  (ECF No. 16-9, pp. 11;

ECF No. 16-11, pp. 89-90).  She initially denied medication side effects and reported that treatment

improved her quality of life and her ability to perform daily activities.  (ECF No. 16-11, p. 90).

Her examination findings were normal, and her medications were refilled.   In January 2018, Plaintiff indicated that her average pain level had risen to 8/10.  (*Id*. at 89).

On January 3, 2018, Plaintiff advised Dr. Garlow that the last injection relieved her symptoms for approximately one week.  (ECF No. 16-10, pp. 6-7).  Other than "general irritability" in the medial compartment, her exam was normal.  She requested an increase in her Oxycodone dosage, but Dr. Garlow refused.  He indicated that she was a candidate for viscosupplementation, which involved injecting hyaluronic acid into the joint to reduce friction during movement.  There is, however, no indication that she followed up with this treatment.

Five days later, Dr. Belinga completed a treating physician's seizure report indicating Plaintiff suffered from partial symptomatic epilepsy with complex partial seizures.  (ECF No. 16-9, pp. 108-109).  He noted that she experienced approximately one seizure per month, having most recently experienced two seizures in April 2017 and one in December 2017.  Her last medication adjustment occurred on December 27, 2017.  Her seizures were characterized by altered awareness with residual fatigue and confusion for a few seconds thereafter.

On January 17, 2018, Plaintiff denied any seizure activity since her last visit and reported stable insomnia.  (ECF No. 16-10, pp. 4-6; ECF No. 16-12, pp. 2-5).  PT had reportedly made her pain worse, which she now rated as a 7/10.  An exam, however, revealed only lumbar pain and right lower extremity numbness.  She requested a second neurosurgical consult.  Nurse Walling advised her to continue taking Vraylar, Trazodone, and Meloxicam and provided a referral.

Between February and April 2018, Plaintiff followed up with LTS on several occasions.  (ECF No. 16-11, pp. 43-49, 82-88). At the February office visit, Brett Whatcott, D.O. noted no deterioration in her neurological symptoms and unchanged exam findings.  (*Id*. at 88).  As such, her medications were continued.  Progress notes from March document some improvement,

following a knee injection, allowing her to perform basic activities she could not perform prior to treatment. (*Id*. at 46, 84-87). In April, she even reported going to the gym. (*Id*. at 43, 82).

Additionally, in February 2018, Jonathan Norcross, M.D. reviewed the evidence of record and affirmed Dr. Hazlewood's previous assessment. (ECF No. 16-4, pp. 43-46, 67-70).

A follow up MRI in March 2018 was consistent with earlier findings, showing only a small to moderate central disc bulge at the L4-L5 level and a central disc bulge at the L5-S1 level, with facet arthropathy and canal, lateral recess, and foraminal stenosis at those levels. (ECF No. 16-12, pp. 22-23).

In April, she again denied any recent seizure activity. (ECF No. 16-12, pp. 5-7). Her insomnia was controlled via Trazodone, her bipolar disorder was stable on medication, and her exam was unremarkable. As such, Nurse Walling refilled her medications.

Plaintiff saw Dr. Whatcott monthly between May and September 2018. In May, she reported that the pain relief provided by medication made a "real difference" in her life, rating her average pain level as a 6/10. (ECF No. 16-11, pp. 41-42, 80-81). Dr. Whatcott noted good function and quality of life with her current treatment, despite her complaints of left leg shakes and periodic jerks. In June, Plaintiff complained of total numbness in her right leg and said that her legs "give out sometimes," but she reported improvement in her relationships, mood, overall functioning, and ability to walk, exercise, perform housework, work, and perform self-care tasks since beginning treatment. (*Id*. at 40, 79). Noting abnormal SLR tests and numbness in her right leg from the knee down, Dr. Whatcott continued her medications. In July and August, she affirmed that treatment improved her function and quality of life, denied medication side effects, and acknowledged stable progress toward her pain control goals. (*Id*. at 33, 38, 72, 77). And, in September, Dr. Whatcott granted her request for a one-month trial of Oxycodone. (*Id*. at 68-69).

On September 12, 2018, Plaintiff complained of seizure activity following a recent change in her depression medication. (ECF No. 16-3, p. 96-97, 116-117; ECF No. 16-12, pp. 46-47). She purportedly lost her speech for one day, so the dosage was returned to its previous level. To protect her from seizures while the medication changes took effect, Dr. Belinga temporarily increased her Carbamazepine.

On October 2, 2018, Plaintiff disclosed worsening hand shaking and numbness in both hands. (ECF No. 16-12, pp. 8-10). Her seizure disorder remained stable, and Nurse Walling noted decreased strength in her hands with tremors and tenderness and pain in her cervical spine. X-rays again showed only mild degenerative changes at the C5-6 and C6-7 levels, so Nurse Walling referred her to a neurologist and refilled the Vraylar. (*Id*. at 24-25).

Two weeks later, Plaintiff reported no seizures since her last visit. (ECF No. 16-3, pp. 99-100, 118-119; ECF No. 16-12, pp. 27-28, 49-50). Her physical exam remained unremarkable, and Dr. Belinga continued her medications unchanged.

In November and December 2018, Plaintiff returned to Nurse Walling. (ECF No. 16-12, pp. 11-13). Initially, she complained of neck pain radiating into her hands but denied any seizure activity since her last visit. On exam, Nurse Walling noted that Plaintiff exhibited tenderness and pain in the cervical spine with no other abnormalities. However, by December, her physical exam was normal. Accordingly, no medication changes were warranted. (*Id*. at 66-68).

On December 10, 2018, an EEG was normal, showing no focal slowing or seizure-like activity. (ECF No. 16-3, pp. 102, 115; ECF No. 16-12, pp. 29, 51). At follow-ups with Dr. Belinga in December 2018 and February 2019, she continued to report improvement in her seizures since her last visit. (ECF No. 16-3, pp. 103-104, 120-121; ECF No. 16-12, pp. 30-31, 52-53). Her exams were unremarkable, and Dr. Belinga continued her medications. In February, she reported

three episodes of "freezing" up and difficulty speaking.  (ECF No. 16-3, pp. 106-110, 122-123;
ECF No. 16-12, pp. 55-56, 63-64).  Noting that these were not exactly seizures, Dr. Belinga
increased her Carbamazepine dosage.

On March 28, 2019, Plaintiff rated her neck, left hip, and back pain as a 7/10.  (ECF No.
16-12, pp. 69-71).  An exam revealed pain in her cervical and lumbar spine, as well as tremors and
tenderness in her left upper leg.  Nurse Walling prescribed a Medrol Dosepack and stretching
exercises and advised her to consult with Dr. Belinga regarding the tremors.

On April 10, 2019, Plaintiff denied any new seizure activity, but reported issues with
muscle jerks and tremors.  (ECF No. 16-3, pp. 112-114).  Dr. Belinga characterized these episodes
as muscle spasms and continued her medication unchanged.  In May, an exam revealed a normal
ROM, cranial nerves, muscle strength and tone in all extremities, sensation to light touch
throughout, finger-nose-finger coordination, rapid alternating movements, gait, and arm swing.
(ECF No. 16-3, pp. 90-91).  Dr. Belinga noted that her seizure disorder was stable and advised her
to continue her current plan.

On May 20, 2019, Dr. Whatcott completed a Medical Source Statement, indicating he had
treated Plaintiff every four months since February 2019.  (ECF No. 16-12, pp. 77-81).  By his
account, her symptoms were frequently severe enough to interfere with her attention and
concentration, and she experienced medication side-effects including dizziness, drowsiness, and
an upset stomach.  Dr. Whatcott opined she could sit for 120 minutes at one time for a total of at
least six hours; stand for 60 minutes at a time for a total of less than two hours; and walk for a total
of two hours per day.  He noted no ambulation assistance was needed, she would not need to
alternate positions, and she would not require unscheduled breaks.  Further, he indicated she could
occasionally lift 20 pounds or less, but never 50 pounds, and she could stoop, crouch, kneel, and

climb stairs 10 % of an eight-hour workday.  However, he determined her productivity level would be 75 % or less and that she would miss four days of work per month due to her symptoms and treatment.

On June 10, 2019, Plaintiff reported infrequent mini seizures and dysphasia.  (ECF No. 16-3, pp. 93-95).  Dr. Belinga documented continued body tremors; prescribed Primidone, to be stopped if the tremors improved; and refilled the Tegretol.

Three days later, Plaintiff reported that her PCP had taken her off Vraylar due to tremors.  (ECF No. 16-2, pp 110-112).  The tremors continued but were "not so bad."  However, due to increased depression, APRN James Gattis advised her to resume the Vraylar.

Six days later, Plaintiff complained of back and left side pain.  (ECF No. 16-3, pp. 85-87).  Lifting, walking, and standing on her feet for too long exacerbated her pain.  A physical exam revealed tenderness, pain, and spasm in the lumbar spine.  After diagnosing her with acute left-sided back pain and sciatica, seizure disorder, and bipolar I disorder, Nurse Walling advised Plaintiff to utilize heat and stretching exercises for her back pain.   He also prescribed Cyclobenzaprine and a Medrol Dosepack.  Plaintiff returned to Nurse Walling in July with worsening lower back and neck pain that radiated into her left lower and upper extremities, which she rated as a 6/10.  (ECF No. 16-2, pp. 46-51; ECF No. 16-3, p. 88).  She exhibited a decreased ROM in her cervical and lumbar spine and left hand.  X-rays of her lumbar spine revealed minimal sacroiliac disk height loss at the L5 level, slightly progressed since 2013.  Nurse Walling continued her current medication regimen without change and ordered an MRI of her cervical spine, which showed multilevel degenerative changes of the cervical spine, worst at the C5-6 and C6-7 levels, with moderate left neural foraminal stenosis and mild to moderate spinal canal narrowing.  (ECF No. 16-2, pp. 53, 58).

On July 11, 2019, Plaintiff denied experiencing any seizure activity since her last visit but continued to experience tremors. (ECF No. 16-2, pp. 107-109). Nurse Gattis increased her Effexor and Vraylar dosages and continued her Tegretol unchanged. On July 31, Plaintiff had a normal ROM in her right knee with no instability or effusion and full strength. (ECF No. 16-3, p. 34, 47). However, some points of weightbearing were tearful. X-rays revealed increased subluxation, osteophyte formation, and medial collapse. (*Id*. at 49). The radiologist's interpretation was degeneration in the right knee.

On August 2, 2019, Plaintiff followed-up regarding her right knee. (ECF No. 16-3, pp. 32-33). She was wearing a brace and no instability or effusion were noted. Plaintiff exhibited a full ROM with full strength, but McMurray testing was uncomfortable. Dr. Garlow assessed underlying degeneration in the right knee, noting her recent x-rays. Plaintiff opted to try Tylenol and anti-inflammatories. Nerve conduction studies conducted on August 6, 2019, revealed severe sensory neuropathy in her lower extremities. (ECF No. 16-2, pp. 152-154).

On August 8, 2019, Plaintiff complained of migraines. (ECF No. 16-2, pp. 143-145). Additionally, she was purportedly experiencing seizures at least once per week, each lasting five to 10 minutes. Dr. Belinga discontinued the Primidone and Tegretol in favor of Keppra.

Plaintiff received a left sacroiliac joint injection on August 9, 2019. (ECF No. 16-2, pp. 29-32, 34-37). In follow-up visit on September 9, she rated her pain as a 6/10 with no increase in function post injection. (*Id*. at 33, 38).

On August 19, 2019, Nurse Gattis documented a normal physical exam, including a normal gait, station, and muscle strength and tone. (ECF No. 16-2, pp. 104-106). He advised her to continue her current medications, to develop a daily routine, and he prescribed Keppra and Vraylar.

Also on September 9, 2019, Plaintiff received a second left lumbar epidural steroid injection ("LESI"). (ECF No. 16-3, pp. 26-30). The following day, she reported that she was doing better and that the Keppra was working. (ECF No. 16-2, pp. 146-147). Dr. Belinga advised her to continue taking the Keppra.

Plaintiff returned to Dr. Garlow for follow-up on September 11, 2019. (ECF No. 16-3, pp. 41-42, 56-57). X-rays of her right knee were unchanged, so he administered a steroid injection into her knee.

On September 19, Plaintiff received another LESI. (ECF No. 16-2, pp. 24-28, 39-43; ECF No. 16-3, pp. 11-13).

Two weeks later, she reported experiencing a seizure the previous day that lasted 25 minutes. (ECF. No. 16-2, pp. 149-151). Dr. Belinga documented some improvement and opined that the increased dosage of Effexor could be lowering the efficacy of the Keppra. Accordingly, he raised her Keppra dosage.

Although she did experience some occasional breakthrough pain, on October 10, 2019, Plaintiff advised Dr. Whatcott that her pain was well controlled. (ECF No. 16-2, pp. 63-67). She also denied experiencing any side-effects and indicated that the steroid injection she had received the previous month "helped a lot." Her average pain level over the past week was a 7.7/10. Narcotic pain medication, antidepressants, and a TENS unit reportedly provided her the most relief.

In follow-up on October 14, 2019, her pain remained at a 7/10 with no increase in function since her last injection. (ECF No. 16-2, p. 28; ECF No. 16-3, pp. 2-4, 15-21, 23-24). Pain specialist, Natalie Strickland, M.D., noted tenderness to palpation over the sacroiliac ("SI") joint.

Concluding that her symptoms were the result of SI joint pain, she administered an intra-articular SI joint injection.

On October 23, 2019, because Plaintiff reported no significant relief from her knee pain with NSAIDs or steroid injections, Dr. Garlow recommended right knee arthroscopy. (ECF No. 16-3, pp. 44, 59).

Five days later, she complained of jerking movements throughout but no recent seizure activity. (ECF No. 16-2, 137-139). She was alert and fully oriented with normal speech, cranial nerves, motor system, reflexes, sensation, coordination, and gait. Dr. Belinga concluded she was doing better, from a seizure standpoint, with the current Keppra dosage, despite being off the Primidone and Tegretol.

On October 31, 2019, she received a second SI joint injection. (ECF No. 16-2, pp. 20-23; ECF No. 16-3, pp. 5-10, 22).

Despite some breakthrough pain in November, Dr. Whatcott indicted that her pain was well controlled. (ECF No. 16-2, pp. 68-72). Unfortunately, the last injection had not been very helpful, as she continued to experience moderate to severe pain, which she rated as a 6.6/10. However, her physical and mental exams remained unchanged.

Two days later, Plaintiff returned to Dr. Belinga's office. (ECF No. 16-2, pp. 140-142). She had experienced three seizures since her last visit, which was more than she typically experienced, as she typically went four to five months between seizures. Further, she continued to experience jerking throughout her body. Dr. Belinga noted she had been doing well until two additional medications were added. As such, he again increased her Keppra dosage. In an undated letter, Dr. Belinga indicated Plaintiff was under his care for seizure disorder. (ECF No. 16-2, pp. 136). He reported that her last seizure was on November 10, 2019.

Plaintiff underwent chondroplasty of the right knee with removal of loose bodies on December 5, 2019.  (ECF No. 16-3, pp. 37-39, 52-54).  No complications were noted.

On December 9, 2019, she reported that her back pain was manageable on her current medication regimen.  (ECF No. 16-2, pp. 73-77).  Due to her recent knee surgery, she was also taking Percocet for postoperative pain.  And, one week prior, she had been treated in the ER for a seizure.  At this time, she rated her average pain as a 7.7/10.  Dr. Whatcott opted to continue her current medications because she consistently reported meaningful improvement in both pain and function, and he could see no compelling reason to change.

On March 3, 2020, an MRI of Plaintiff's thoracic spine revealed possible mild left foraminal narrowing at the C5-6 and C6-7 levels due to small protrusions and facet hypertrophy with mild biforaminal narrowing at the T10-11 level and, to a lesser degree, the T9-T10 level.  (ECF No. 16-2, pp. 8-9).  An MRI of her lumbar spine also showed a prominent broad-based disk bulge, moderately severe overall canal stenosis with narrowing of the left exiting neural canal; a broad-based disk bulge at the L5-S1 level with a small central disk protrusion and mild narrowing of the spinal canal and both neural canals; and a small nodule in the right L5 paraspinous area that may represent a small neoplasm such as a nerve sheath tumor.  (*Id*. at 12-16).

### b.  Discussion

The relatively benign results and exam findings noted above, along with Plaintiff's frequent reports that pain medication relieved her symptoms and improved her overall function and quality of life, support the ALJ's finding that she could perform a range of sedentary work.  *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  Further support is gleaned from the opinions of Dr. Whatcott and the two state agency physicians.  Dr. Whatcott opined that she could

sit for two hours at one time for a total of at least six hours, stand for one hour at a time for a total of less than two hours, walk for a total of two hours per day, and occasionally lift up to 20 pounds. SSR 83-10, 1983 WL 31251, *5 (noting sedentary work involves lifting no more than 10 pounds at a time; occasionally lifting or carrying articles like docket files, ledgers, and small tools; periods of standing or walking totaling no more than about two hours of an eight-hour workday; and sitting for approximately six hours of an eight-hour workday). He also concluded that she would not need to alternate positions or take unscheduled breaks. The agency physicians agreed, indicating that Plaintiff could perform sedentary work with only occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps/stairs and no climbing of ladders/ropes/scaffolds or exposure to hazards.

Although Plaintiff's right knee impairment did require two surgeries, there is no evidence to indicate that she is totally incapable of performing sedentary work with occasional balancing, stooping, kneeling, crouching, crawling, and climbing of stairs/ramps. As the ALJ noted, Dr. Whatcott's opinion that she could only stoop, crouch, kneel, and climb stairs 10 percent of an 8-hour workday, is not supported by the objective evidence. None of her doctors restricted her physical activity, even after her knee surgeries. And, her second surgery, performed in December 2019, appears to have been successful. While we do not doubt that she still experiences a degree of pain associated with this impairment, there is no requirement that she be free of all pain to return to work. *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (mere fact that working causes pain or discomfort does not require a finding of disability) (citations omitted).

It also appears that Plaintiff's back impairments were adequately accounted for in the ALJ's restrictions. We acknowledge her MRI findings and treatment history, but also note the conservative nature of her treatment and her reports that rest and a change in position helped to

relieve her symptoms.  *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding conservative treatment is inconsistent with disability).  We note that surgery was not recommended.  Further, with treatment, Plaintiff consistently reported overall improvement in both her function and quality of life.  On numerous occasions, she indicated that her pain was well controlled, and at times, denied experiencing neck and back pain.  In December 2019, Plaintiff described her back pain as manageable.  *See Patrick*, 323 F.3d at 596 (holding an impairment that can be controlled by treatment or medication is not disabling).

The mild nature of Plaintiff's seizure disorder, as evidenced by the relatively few episodes documented in the treatment notes, also indicates that this condition was responsive to treatment. *Id.*  In November 2019, she reported experiencing one seizure every four to five months. Moreover, at the hearing, Plaintiff maintained that she experienced seizures "once in a while," and acknowledged that they were well controlled.  (ECF No. 16-3, pp. 136-137).  Dr. Belinga also consistently noted overall improvement.

We also note that several of Plaintiff's purported "seizures" were related to her ingestion of illegal substances, rather than true seizures.  We find that this undermines the severity of her condition, as an individual suffering from a disabling seizure disorder would know better than to intentionally ingest illegal substances.  As such, we find that the ALJ included all the limitations stemming from this disorder in his finding that she could not climb ropes/ ladders/scaffolds or work near hazards.  And, therefore, substantial evidence supports the ALJ's physical RFC determination in this case.

### 2.    Mental RFC

Plaintiff also contends that the ALJ broadly described her mental impairments as anxiety and depression and failed to account for all the limitations resulting from her actual diagnoses of

major depressive disorder, PTSD, bipolar disorder, ADHD, personality disorder, and generalized anxiety disorder.  While it is true that the Plaintiff was diagnosed with each of these disorders at various times during the relevant period, mere diagnoses alone are not sufficient to prove disability, absent some evidence to establish a functional loss from those diagnoses. *See Trenary v. Bowen*, 898F.2d 1361, 1364 (8th Cir. 1990).

### a.  Summary of Relevant Medical Evidence

In October 2015, prior to her alleged onset date, Plaintiff received inpatient care at Valley Behavioral Health Hospital ("VBHH") for suicidal ideations.  (ECF No. 16-8, pp. 6-17, 25-29).  Although she presented with a depressed mood and affect, her appearance was appropriate; she was alert, fully oriented, and cooperative; and her memory, concentration, thought processes, and thought content were intact. Plaintiff denied hallucinations and delusions, her intelligence was average, and her judgment and insight were fair.  Hospital staff prescribed Wellbutrin and Seroquel, and at the time of her discharge, Dr. Eliot Cole noted her mental status to be entirely normal.  He listed her condition as improved and opined that her prognosis was good.  Plaintiff even rated her depression as a 0/10 and her anxiety as a 2/10.  Her discharge diagnoses were methamphetamine-induced depression and methamphetamine use disorder, and Dr. Cole recommended continued outpatient care.

At an outpatient evaluation in late October 2015, Plaintiff presented with a depressed mood, flat affect, limited insight and judgment, and soft, halting speech.  (ECF No. 16-8, pp. 9-17).  The provider discontinued the Effexor, recommended a decrease in her Latuda dosage, increased her Trazodone dosage, prescribed Lamictal, and advised continued counseling and medication management.  When she returned on December 30, her mood and affect were anxious, but her mental status was otherwise unremarkable.  (*Id*. at 92-97).  She was prescribed Paxil.

In September 2016, Plaintiff returned to VBHH with continued anxiety but improved depressive symptoms.  (ECF No. 16-8, pp. 86-91).  Aside from an anxious mood and affect, her exam was normal.  The provider tapered her off the Paxil, added back the Effexor, decreased her Seroquel dosage, and prescribed Prozac.

On March 22, 2017, Plaintiff reported that she had stopped taking her medication in October 2016.  (ECF No. 16-8, p. 85).  She was reportedly now experiencing panic attacks, crying spells, sleep problems, passive suicidal ideation, and "problems getting out of bed."  After noting an anxious mood and congruent affect, APRN Kellie Berry-Hert prescribed Effexor and Trazodone.  Plaintiff complained of continued mood changes and sleep problems and reported cutting herself in June.  (*Id*. at 84).  Nurse Berry-Hert refilled the Effexor and increased her Trazodone dosage.

In October 2017, Plaintiff saw APRN Katherine Darby for medication management.  (ECF No. 16-8, p. 83).  Based on her reported mood lability, increased anxiety, and sleep issues, Nurse Darby diagnosed bipolar disorder II, reduced Plaintiff's Latuda dosage, discontinued the Effexor, increased her Trazodone dosage, and prescribed Lamictal.

On October 10, 2017, Jerry R. Henderson, Ph.D., a non-examining state agency medical consultant, reviewed Plaintiff's medical records and concluded there was insufficient evidence to rate her mental impairments.  (ECF No. 16-4, pp. 7-8, 19-20).

Two months later, Plaintiff told Nurse Walling that she did not believe the Latuda was working.  (ECF No. 16-10, pp. 10-12).  She reported being "up and down," and indicated that Paxil had worked well for her in the past.  Nurse Walling did note a depressed mood and prescribed Vraylar and a wean off the Latuda.  He also continued the Trazodone.

Patricia J. Walz, Ph.D. conducted a mental diagnostic evaluation of Plaintiff on January 4, 2018. (ECF No. 16-11, pp. 16-20). Plaintiff drove herself to the appointment and indicated she had applied for disability due to bipolar, attention deficit disorder ("ADD"), and issues with her back. She admitted that her medications helped "most of the time." Dr. Walz observed that Plaintiff's grooming and hygiene were good, and she was cooperative and polite. Her mood was sad and her affect flat, however, her speech was normal and her thought processes, thought content, and perception were unremarkable. Plaintiff denied current suicidal or homicidal ideation and reported independence in her activities of daily living with no hygiene changes, although she did endorse fleeting thoughts of suicide without a plan or intent. Dr. Walz opined that Plaintiff's intellectual functioning was in the low average range and diagnosed bipolar disorder and personality disorder with borderline traits. Regarding adaptive limitations, Dr. Walz noted that Plaintiff did not drive often because of seizures, paced a lot, and had no friends or other social outlets, aside from her parents. While she also noted that Plaintiff's moods would impair her social skills, she found Plaintiff able to communicate intelligibly and effectively. Regarding her ability to cope with the mental demands of basic work-like tasks, Dr. Walz noted Plaintiff's report of memory problems was likely attributable to medication side effects. She also opined that Plaintiff had some limitation in attention, concentration, and pace, noting that her energy level appeared low and her speed of information processing slow.

On January 17, 2018, Nurse Walling documented improvement in her bipolar disorder with Vraylar. (ECF No. 16-10, pp. 4-6). She was alert and fully oriented with a normal mood and affect and stable insomnia.

The following month, Plaintiff visited Stonehaven Behavior Health & Wellness ("SBHW") for a diagnostic evaluation. (ECF No. 16-10, pp. 184-200). She listed her medications as Vraylar,

Trazodone, Tegretol, and Cogentin, and indicated that she needed a therapist for her bipolar, PTSD, and ADHD.  Plaintiff complained of mood swings and rage, reportedly having last used methamphetamine 10 months prior.  On exam, she was fully oriented with an anxious and depressed mood, an anxious affect, normal intelligence, intact memory and judgment, and normal attention and concentration, motor behavior, speech, and thoughts.  Based on her response to screening questions, the treatment provider assessed Plaintiff with bipolar disorder I, generalized anxiety disorder, depression, and attention deficit hyperactivity disorder ("ADHD"), and recommended eye movement desensitization and reprocessing ("EMDR") therapy.

On April 18, 2018, Nurse Walling noted a normal mood and affect, specifically documenting no anxiety, depression, suicidal ideation, or suicidal plans.  (ECF No. 16-12, pp. 5-7).  He also opined that her bipolar disorder was stable.

On May 15, 2018, Plaintiff began seeing Nurse Gattis at the Center for Psychiatric Wellness ("CPW").  (ECF No. 16-11, pp. 59-61).  He found her to be alert, fully oriented, and well-groomed with good eye contact.  She exhibited a depressed mood and affect with normal speech, linear and goal directed thought processes, and normal thought content.  Nurse Gattis observed an average fund of knowledge, normal insight and judgment, and normal cognition, memory, attention, and concentration.  He then assessed Plaintiff with major depressive disorder, post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, and borderline personality and refilled the Vraylar.  He also recommended individual therapy with an external provider.

Also in May 2018, Michael Hazlewood, Ph.D., a non-examining state agency medical consultant, reviewed the evidence of record and opined that Plaintiff could perform work where the interpersonal contact required is incidental to the work performed and the required tasks are no more complex than those learned and performed by rote, involve few variables, and require

minimal judgment, and simple, direct, and concrete supervision.  (ECF No. 16-4, pp. 40-41, 46-49, 64-65, 70-73).  He found her to be moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors.

On June 18, 2018, Plaintiff followed up with Nurse Gattis, reporting continued fluctuations in mood, energy, and appetite, sleep problems, nightmares, excessive worry, and agitation.  (ECF No. 16-11, pp. 56-57).  However, she was alert and fully oriented with a euthymic mood and affect, good insight and judgment, normal thoughts, and intact cognition and memory.  Nurse Gattis increased her Zoloft dosage, adjusted her Vistaril dosage, and continued her other medications.  On June 27, 2018, the provider at LTS indicated that her psychiatric condition had deteriorated, but aside from noting some depression, failed to provide any more information concerning her mental status.  (ECF No. 16-11, p. 40).

Plaintiff failed to show up for visits scheduled in July and August 2018.  (ECF No. 16-11, pp. 54-55).  On August 29, she admitted being out of medication for approximately one month, reporting emotional volatility, poor energy and motivation, insomnia, and feelings of worthlessness.  (*Id*. at 52-53).  She also complained of nightmares, intrusive memories, and excessive worry.  Aside from a depressed mood with a congruent affect, her exam remained unchanged.  Nurse Gattis advised her to resume Zoloft, continue Vraylar, and prescribed Remeron and Prazosin.  Approximately two weeks later, Plaintiff denied experiencing anxiety, panic,

depression, insomnia, social issues, and memory loss.  (ECF No. 16-3, p. 96-97).  Further, Dr. Belinga found her to be alert, fully oriented, and attentive.

On September 26, 2018, although she reported continued anxiety after experiencing a single panic attack, she also admitted she was doing "okay."  (ECF No. 16-11, pp. 62-66).  She reported "decent" energy and motivation, improved sleep, and effective control of her nightmares. Other than an anxious mood and affect, her mental status was unremarkable.  As such, Nurse Gattis increased her Zoloft dosage and continued her medications.

On October 2, 2018, Nurse Walling noted a normal mood and affect with no evidence of anxiety or depression.  (ECF No. 16-12, p. 9).

Two months later, she reported feeling "worse in a way."  (ECF No. 16-12, pp. 38-39). This appeared to be precipitated by her daughter's move to Chicago.  She reported increased anxiety and indicated it was difficult to get out of the house, however, she was sleeping well and denied hypersomnolence.  On exam, the Plaintiff was alert and fully oriented with an emotional mood and congruent affect.  Nurse Gattis noted she appeared anxious/restless but continued her medications unchanged and referred her for individual therapy.

On December 13, 2018, Nurse Walling noted Plaintiff's bipolar disorder to be stable with a normal mood and behavior.  (ECF No. 16-12, pp. 66-68).

In January and March 2019, Plaintiff followed up with Nurse Gattis.  (ECF No. 16-12, pp. 40-44, 58-61).  Though she reported problems with anxiety and nightmares, in January, she disclosed improvement in most of her other symptoms.  Aside from an anxious mood and affect, her mental status was normal, and she was socializing on a limited basis.  Nurse Gattis discontinued the Zoloft, prescribed Effexor at Plaintiff's request, and refilled her other medications.  At the March 2019 appointment, Plaintiff reported that she was "a little worse," but the record included

no mental status findings.  On March 28, 2019, Nurse Walling noted Plaintiff to be alert and fully oriented with a normal mood and affect.  (*Id*. at 69-71).

In May 2019, while visiting Dr. Belinga, Plaintiff denied any memory loss, confusion, nervousness, anxiety, depression, insomnia, or difficulty concentrating.  (ECF No. 16-3, pp. 90-92).  She was alert and fully oriented with normal speech and comprehension.  And, the following month, she was stable, advising Nurse Walling that psychiatry had decreased her dose of Vraylar.  (*Id*. at 85-87).

On June 19, 2019, Plaintiff advised Nurse Gattis that her PCP had taken her off the Vraylar due to tremors.  (ECF No. 16-2, pp. 110-112).  Her mood had deteriorated, and she was feeling more depressed with hypersomnolence, erratic appetite, anergia, amotivation, social isolation, and anhedonia.  Nurse Gattis documented her mood as "confused" with a congruent affect and advised her to resume the Vraylar.  On July 11, Plaintiff reported experiencing mood swings and constant anxiety.  (ECF No. 16-2, pp. 107-109).  She also reported daily suicidal ideations but indicated she would not act on those thoughts.  Nurse Gattis increased her Effexor and Vraylar dosages and continued the Tegretol unchanged.  That same month, Plaintiff Nurse Walling noted that Plaintiff's mood was dysphoric and advised her to continue treatment with psychiatry.  (ECF No. 16-2, pp. 46-51).

On August 19, 2019, Plaintiff admitted she had not been "super depressed," and described her energy as "okay."  (ECF No. 16-2, pp. 104-106).  Her motivation was lacking, and she continued to experience anxiety and constant worry.  On exam, she was alert and fully oriented with good eye contact, an antsy mood, an incongruent affect, fair insight and judgment, intact cognition and memory, and normal attention and concentration.

On September 12, 2019, Plaintiff had developed a routine and was more motivated for change. (ECF No. 16-2, pp. 117-118, 125-126, 133-134). She even requested a change from Effexor to Zoloft. She was socializing some and trying to eat healthy. Nurse Gattis advised her to continue her medications and individual therapy.

In November 2019, Plaintiff reported variable moods, anxiety, and feeling overwhelmed. (ECF No. 16-2, pp. 96-98). Helping her schizophrenic sister and preparing meals for her brother and nephew, while another brother was incarcerated, had resulted in increased stress. Nurse Gattis noted her to be antsy with a congruent affect, discontinued the Remeron, and prescribed Wellbutrin SR and Hydroxyzine. The following month, Nurse Gattis discontinued the Wellbutrin and added seizure disorder to her list of diagnoses. (ECF No. 16-2, pp. 81-88, 93-95). Despite depressed moods, anxiety, and decreased energy and motivation, she was sleeping reasonably well and socializing with her sister. Nurse Gattis found her to be alert and fully oriented with normal cognition, memory, attention, and concentration. She exhibited good eye contact, intact thought processes, and fair to good insight and judgment. As such, he prescribed Buspirone and directed her to continue her other medications.

### b.  Discussion

Plaintiff argues the ALJ's mental RFC finding does not address the attention, concentration, persistence, and pace issues noted by Dr. Walz. However, the ALJ limited her to simple, routine, and repetitive tasks, and Eighth Circuit precedent is replete with cases in which an ALJ's RFC determination was found sufficient where an ALJ accounted for deficits in concentration, persistence, and pace by limiting a claimant to simple, repetitive, and routine tasks. *See, e.g., Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (citing *Howard v. Massanari*, 255 F.3d 577, 581-582 (8th Cir. 2001)); *Bractel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997); *Hughes v.*

*Colvin*, 2016 WL 7444961, at *5 (W.D. Ark. Dec. 27, 2016) ("As the ALJ's hypothetical to the VE in this case limited Plaintiff to simple, repetitive, routine tasks, said hypothetical sufficiently took into account any deficiencies Plaintiff had in concentration, persistence, or pace.").

While we recognize Dr. Whatcott's opinion that her productivity level would be 75 % or less and that she would miss four days of work per month due to her symptoms and treatment, we can ascertain no direct evidence in the record to support such a finding. To the contrary, the ALJ's mental RFC is substantially supported by both the treatment records and the opinion of an agency physician. Dr. Michael Hazlewood determined Plaintiff could perform work where the interpersonal contact required is incidental to the work performed and the required tasks are no more complex than those learned and performed by rote with few variables, minimal judgment, and simple, direct, and concrete supervision. Nurse Gattis also consistently noted Plaintiff to be alert and fully oriented with good eye contact; with normal speech, thought content, cognition, memory, attention, and concentration; intact insight and judgment; linear and goal directed thought processes; and an average fund of knowledge. Further, the record makes clear that the prescribed medications were effective, when taken as prescribed.

However, the Plaintiff was not always compliant with treatment, missing appointments and running out of medication. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). She also used illegal drugs and denied depression, anxiety, and panic symptoms to both Dr. Belinga and Nurse Walling. Further, treatment notes reveal that some of her symptoms were situational in nature, related to her daughter moving away and having to assist her schizophrenic sister and care for her brother and nephew. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (holding that the ALJ may consider the situational

nature of the Plaintiff's depression, due to marital issues).  Each of these factors undermine the Plaintiff's contention that her mental impairments were disabling.

Additionally, aside from the one hospitalization in 2015, her symptoms were never severe enough to warrant additional inpatient care.  Moreover, Nurse Gattis gave no indication that Plaintiff would be unable to handle any of the mental demands of work.  By her own reports, she got along well with others, including authority figures, and could follow directions.  Crediting her reports of depression, anxiety, and difficulty being around others, the ALJ further limited her to occasional interaction with coworkers, supervisors, and the public.  As such, we find substantial evidence to support the ALJ's mental RFC determination.

### B.  Subjective Complaints

Plaintiff also insists that the ALJ failed to properly evaluate her subjective complaints.  The ALJ is required to consider all the evidence relating to a plaintiff's subjective complaints, including: (1) her daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians."  *Id*.  However, an ALJ need not expressly discuss, as opposed to consider, each *Polaski* factor.  *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011); *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007).

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them, *Polaski*, 739 F.2d at 1322, but "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances."  *Wright v. Colvin*,

789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)).

Plaintiff reported the ability to care for her son, brother, and nephew; assist her schizophrenic sister; attend to her own personal care needs; prepare simple meals; perform household chores such as laundry, ironing, sweeping, and cleaning; shop in stores on a weekly basis; visit with family in person and via telephone; attend medical appointments; follow written instructions; get along with others, including authority figures; watch television; and handle her personal finances.  (ECF No. 16-7, pp. 42-49).  Further, she denied ever losing a job due to difficulty getting along with others.  These admitted daily activities and functional abilities support the ALJ's decision.

Plaintiff also reported that rest, positional changes, and the medications prescribed helped to relieve both her pain and psychological symptoms, while lifting, walking, and standing on her feet for too long exacerbated her pain.  As for side-effects, although Dr. Whatcott noted some in his medical statement, the few noted were immediately met with medication changes and/or adjustments.  And, aside from those instances, the Plaintiff denied experiencing side-effects.  Accordingly, we find that the ALJ adequately addressed Plaintiff's subjective complaints and accounted for her pain in limiting her to a range of sedentary work.

### C.    Step Five Determination

Lastly, the Plaintiff argues the ALJ improperly found her capable of performing work as an addressing clerk, toy stuffer, and tile table worker.  Plaintiff posits that the hypothetical question posed to the vocational expert ("VE") contained inaccurate information, namely a limitation to sedentary work, rather than the range of light work identified by the ALJ in the RFC.  Further, she

urges the Court to find that, even at the sedentary level, the hypothetical was improper because it omitted several limitations that were proven by the record.

At step five of the analysis, "the burden shifts to the Commissioner to show that the claimant has the physical residual capacity to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors such as age, education, and work experience." *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001). "For guidance on such questions, ALJs often seek the views of 'vocational experts.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). It is well established that "[t]he Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005). However, the hypothetical question must encompass all the Plaintiff's relevant impairments. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) (holding VE testimony does not constitute substantial evidence if not based on a hypothetical question that includes all the Plaintiff's relevant impairments); s*ee also Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011) (testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies) (citations omitted).

As discussed above, the ALJ's actual RFC assessment was for a reduced range of unskilled, sedentary work, and the ALJ's reference to light work in his RFC finding was simply a scrivener's error. The hypothetical question posed to the VE included a limitation to unskilled sedentary work. (ECF No. 16-3, pp. 145-146). The VE testified that that an individual with those limitations and Plaintiff's age, education, and work experience could perform the representative jobs of addressing clerk, toy stuffer, and tile table worker. (*Id*.). Based upon the VE's testimony, the ALJ properly

determined that the Plaintiff could perform other work that existed in significant numbers in the national economy.  Accordingly, for the same reasons we affirmed the ALJ's RFC determination, we find that the ALJ's reliance on the VE's testimony is supported by substantial evidence.

### IV.    Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of January 2022.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE